# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**Michael J. Kanode Sr.,**
**Petitioner Below, Petitioner**

**FILED**

**June 7, 2013**
**RORY L. PERRY II, CLERK**
**SUPREME COURT OF APPEALS**
**OF WEST VIRGINIA**

**vs) No. 12-0451** (Mercer County 10-C-445)

**Marvin Plumley, Warden, Huttonsville**
**Correctional Center, Respondent Below,**
**Respondent**

## MEMORANDUM DECISION

Petitioner Michael J. Kanode Sr., by counsel Dana P. McDermott, appeals the order of the Circuit Court of Mercer County, entered December 15, 2011, denying his post-conviction habeas corpus petition, in part, and affirming, in part. Respondent Warden Marvin Plumley,[1] by counsel Thomas W. Rodd, filed a response and raised cross-assignments of error. Petitioner filed a reply.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision is appropriate under Rule 21 of the Rules of Appellate Procedure.

In the early morning hours of August 14, 2007, petitioner used a bolt cutter to cut the door chain of the home where his then-wife, Sherry Kanode, and the couple's son, Michael J. Kanode Jr., and infant daughter were sleeping. He entered the home, straddled Ms. Kanode and said "We're going to die; me and you are going to die." Petitioner pulled out a pistol and shot her through the ear and neck.

Petitioner's son was awakened by his mother's screaming and the sound of a gunshot. Petitioner told the son "I killed your mom, and now I'm going to kill myself." The son called 911. The son heard one gunshot inside the house and heard more shots outside. A neighbor reported hearing gunshots. Petitioner fled the scene and was arrested several days later.

Petitioner had threatened to kill his wife before, as recently as July of 2007. She filed a domestic violence petition against him. On July 31, 2007, the family court judge held a hearing on the domestic violence petition. The judge ruled from the bench and granted the wife a

---

[1]Pursuant to Rule 41(c) of the Rules of Appellate Procedure, the name of the current warden has been substituted as the respondent in this action.

1

temporary protective order against petitioner. The Domestic Violence Protective Order was entered August 1, 2007.

Petitioner wrote letters to his son after he was arrested and in jail. At trial, petitioner's son read a portion of the letters to the jury. The letters were admitted into evidence at trial as State's Exhibits 1 and 2. The letters read, in part,

> [T]hat ratt [sic] bitch don't realize what all this sh*t started from before when because she kept pushing sh*t well I'm going to go do my time then f**k it and I'm going come back to do life. Nobody believed I was going to do it, but I f**ked up and couldn't finish.

> Nobody believed me when I told them I was going to do what it was, and now I'm telling you, if … I spend any more time in here – I will get out one day and will, believe me, I will finish what was started with your mom.

On January 23, 2008, a jury convicted petitioner of malicious assault, burglary, attempted murder of the first degree, violation of a protective order and assault during the commission of a felony. Petitioner received the maximum prison sentence for each offense.[2] Petitioner filed a direct appeal of his convictions. On April 8, 2009, this Court denied the petition for appeal without issuing an opinion.

On August 26, 2010, petitioner, by counsel, filed an amended petition for writ of habeas corpus. On April 11, 2011, the circuit court held an evidentiary hearing. Petitioner relied on the *Losh*[3] list and waived certain grounds. The primary issues raised by petitioner were the validity of the burglary charge, the related charge of assault during the commission of a felony, and a double jeopardy argument regarding the wanton endangerment and malicious assault charges. Petitioner also raised an ineffective assistance of counsel claim.

On December 15, 2011, the circuit court entered an order affirming the convictions on the counts of violation of a protective order, malicious assault, and attempted first degree murder. As discussed more fully below, the circuit court vacated with prejudice the convictions on the counts of wanton endangerment, burglary, and assault during the commission of a felony. The circuit court also found ineffective assistance of counsel with regard to those three charges, stating that,

---

[2]On February 26, 2008, the trial court sentenced petitioner to two to ten years for malicious assault, one to fifteen years for burglary, three to fifteen years for attempted first degree murder, two to ten years for assault during the commission of a felony, five years for wanton endangerment, and one year for violation of a protective order, with all sentences to run consecutively.

[3]*See Losh v. McKenzie*, 166 W.Va. 762, 277 S.E.2d 606 (1981) (every prisoner is entitled to one post-conviction habeas corpus hearing in which the prisoner may raise any collateral issues which have not previously been fully and fairly raised).

A great deal of the problem with counsel's performance arose out of him not carefully reading the Final Order of Protection issued by the Mercer County Family Court Judge. The remaining problem arose out of his failing to read State v. Wright, [200 W.Va. 549, 490 S.E.2d 636 (1997)], which is a leading case in West Virginia relating to malicious assault and wanton endangerment. These two errors led to virtually all of the inadequacies prevalent in his performance. There was no motion to dismiss three counts of the indictment, no motions for judgment of acquittal, no objections to the instructions relating to these matters, and no adequate grounds for a motion made to set aside the verdict of the jury. Furthermore, the omissions of counsel with regard to Burglary, Wanton Endangerment and Assault during the commission of a felony resulted in Petitioner being convicted of three felonies which were unwarranted under the circumstances. In short, counsel provided ineffective assistance to Petitioner with regard to these three charges.

On appeal, petitioner raises several assignments of error and Respondent Warden raises two cross-assignments of error. We note that this Court reviews appeals of circuit court orders denying habeas corpus relief under the following standard:

"In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review." Syllabus point 1, *Mathena v. Haines*, 219 W.Va. 417, 633 S.E.2d 771 (2006).

Syl. Pt. 1, *State ex rel. Franklin v. McBride*, 226 W.Va. 375, 701 S.E.2d 97 (2009).

After careful consideration, this Court adopts the findings and conclusions of the circuit court in this matter. We will address the assignments of error raised by the parties.

**Petitioner's Assignments of Error**

Petitioner's first assignment of error is that trial counsel was ineffective when he failed to object to the admission of the letters from the petitioner to his son. He asserts that trial counsel should have raised the chain of custody issue because Ms. Kanode held the original copies of the letters while the prosecuting attorney had only copies. In response, Respondent Warden argues that the circuit court properly found that petitioner did not meet his burden to prove ineffective assistance of counsel in this instance.

The following standard is applied to claims concerning ineffective assistance of counsel:

In the West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984): (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a

3

reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.

Syl. Pt. 5, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995). We find no error by the circuit court in denying habeas corpus relief to petitioner, in part, based on this specific claim of ineffective assistance of counsel. The circuit court noted that when trial counsel was asked why he did not object to the letters at issue, he stated that he recognized petitioner's handwriting and chose not to withhold from the trial court an item of evidence that he knew was genuine.

Next, petitioner challenges the sufficiency of the evidence to support his convictions. Specifically, he contends that without the admission of his letters to his son, there was insufficient evidence of intent to support the convictions of malicious assault and attempted first degree murder. Respondent Warden replies that substantial evidence supports petitioner's convictions, including the testimony of the victim, the testimony of petitioner's son, and petitioner's letters to his son. We have held that,

> "[a] criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled." Syl. Pt. 3, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995).

Syl. Pt. 5, *State v. Broughton*, 196 W.Va. 281, 470 S.E.2d 413 (1996).

Upon our review, this Court finds that the evidence was sufficient to support the petitioner's convictions of malicious assault and attempted first degree murder. Although petitioner attacks the credibility of the victim, Ms. Kanode, there is no question that witness credibility determinations are within the province of the jury. Syl. Pt. 2, *State v. Bailey*, 151 W.Va. 796, 155 S.E.2d 850 (1967). We see no compelling reason to disturb that finding on appeal.

### Respondent Warden's Cross-Assignments of Error

Respondent Warden raises two cross-assignments of error in his response. He maintains that the circuit court erred by reversing petitioner's convictions for burglary and wanton endangerment. He argues that petitioner committed burglary[4] when he cut the latch chain with

---

[4]The elements of the crime of burglary are set forth in West Virginia Code § 61-3-11, that states, in pertinent part, "[i]f any person shall, in the nighttime, break and enter, or enter without

4

bolt cutters and entered the premises for purposes of committing a violent crime. Petitioner never claimed he had any legal right to enter the home, and he admitted at trial that he did not have such right. Petitioner responds that the family court order did not grant Ms. Kanode exclusive possession of the marital residence. Petitioner argues he may have been guilty of violation of a protective order, but not a crime against property.

This Court finds that the circuit court did not abuse its discretion in reversing petitioner's burglary conviction. The circuit court noted that when the trial court recited the elements of the crime to the jury, it used the phrase "the dwelling house belonging to Sherry Kanode." However, in the protective order, the family court did not grant Ms. Kanode exclusive possession of the marital residence. We find that an essential element of the crime of burglary was not met because petitioner was not prohibited from entering the home. Furthermore, as the circuit court stated, "if there was no valid [b]urglary charge, there was no possibility of being convicted of assault during the commission of a felony that did not exist."

Respondent Warden next argues that the circuit court erred in reversing the wanton endangerment conviction[5] on the ground that it was a lesser included offense of malicious assault.[6] *See State v. Wright*, 200 W.Va. 549, 490 S.E.2d 636 (1997) (in a single-gunshot case, wanton endangerment is necessarily a lesser included offense of malicious assault). In this case, a number of witnesses testified that petitioner fired his pistol multiple times. Respondent Warden argues that the jury could have found that one or more of those additional gunshots were fired in sufficiently close proximity to the victim to constitute the separate crime of wanton endangerment, as charged in the indictment. Petitioner responds that the circuit court did not err because the indictment restricted the count to the one gunshot fired at the victim.

After careful consideration, this Court finds no abuse of discretion in the circuit court's decision to reverse the wanton endangerment conviction as a lesser included offense of malicious assault. The circuit court noted that the evidence at trial demonstrated that petitioner fired one gunshot in the bedroom of the home, when he shot Ms. Kanode. Therefore, the circuit court's decision is consistent with our precedent.

We note that the circuit court's forty-six page order reflects its thorough analysis of the

---

breaking, or shall, in the daytime, break and enter, the dwelling house, or an outhouse adjoining thereto or occupied therewith, of another, with intent to commit a crime therein, he shall be deemed guilty of burglary."

[5]The crime of wanton endangerment is set forth in West Virginia Code § 61-7-12, that provides, in pertinent part, "[a]ny person who wantonly performs any act with a firearm which creates a substantial risk of death or serious bodily injury to another shall be guilty of a felony[.]"

[6]The crime of malicious assault is set forth in West Virginia Code § 61-2-9(a), that provides, in pertinent part, "[i]f any person maliciously shoot, stab, cut or wound any person, or by any means cause him bodily injury with intent to maim, disfigure, disable or kill, he shall, except where it is otherwise provided, be guilty of a felony[.]"

issues raised in the petition for habeas corpus. Having reviewed the opinion order entered on December 15, 2011, we hereby adopt and incorporate the circuit court's well-reasoned findings and conclusions as to all the assignments of error raised by the parties in this appeal. The Clerk is directed to attach a copy of the circuit court's order to this memorandum decision.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** June 7, 2013

**CONCURRED IN BY:**

Chief Justice Brent D. Benjamin
Justice Robin Jean Davis
Justice Menis E. Ketchum
Justice Margaret L. Workman (in part)
Justice Allen H. Loughry II (in part)

**DISSENTING IN PART:**

JUSTICE WORKMAN and JUSTICE LOUGHRY concur in the decision to affirm the circuit court's order regarding petitioner's convictions of violation of a protective order, malicious assault, attempted first degree murder, and wanton endangerment. Justice Workman and Justice Loughry dissent from the decision to affirm the circuit court's order that vacated petitioner's convictions of burglary and assault during the commission of a felony.

12-0451
MD attachment

NOTED CIVIL DOCKET

DEC 1 6 2011

JULIE BALL
CLERK CIRCUIT COURT
MERCER COUNTY

# IN THE CIRCUIT COURT OF MERCER COUNTY, WEST VIRGINIA

STATE ex rel. MICHAEL J. KANODE, SR.        **Petitioner,**

V.                    **CIVIL ACTION NO. 10-C-445,**

ADRIAN HOKE, WARDEN,

HUTTONSVILLE, CORRECTIONAL CENTER,        **Respondent.**

## OPINION ORDER

On October 21, 2009, the Petitioner, Michael Kanode, Sr., presented to the Supreme Court of Appeals of West Virginia a document captioned as a writ of error and petition for rehearing which was deemed to be a petition praying for a writ of habeas corpus ad subjiciendum.

Upon consideration of the case, the Court ordered that a rule issue returnable before the Honorable Derek Swope, Judge of the Circuit Court of Mercer County, West Virginia, for appointment of counsel to file a petition for writ of habeas corpus.

On February 5, 2010, by joint letter, all Mercer County, West Virginia, Judges requested that they be recused from this case. Pursuant to the February 5, 2010, letter Chief Justice Robin Jean Davis appointed Senior Status Judge John S. Hrko for the purpose of presiding in said matter. This Order was executed on February 18, 2010.

On May 4, 2010, a hearing was held in Princeton, West Virginia, and

attended by Michael J. Kanode, pro se and George Sitler, II, counsel for Respondent, Adrian Hoke, Warden . The purpose of the hearing was to carry out the instructions of the Supreme Court of Appeals of West Virginia set forth in it's Order of February 18, 2010, To-wit: " It is therefore considered and ordered that a rule do issue returnable before Honorable Derek Swope, Judge of the Circuit Court of Mercer County for appointment of counsel to file a petition for writ of habeas corpus." During the hearing Michael J. Kanode, Sr. expressly rejected the court approved counsel list and requested the appointment of Dana P. McDermott for the purpose of serving as his counsel and filing a Petition for Writ of Habeas Corpus. At the conclusion of the hearing the Court appointed Dana P. McDermott, WV Bar No. 7363 to represent Mr. Kanode and file a Petition for Writ of Habeas Corpus on his behalf.

On August 26, 2010, Dana P. McDermott, counsel for Michael J. Kanode, Sr. filed "Petitioner's Amended Omnibus Petition for a Writ of Habeas Corpus Ad Subjiciendum in the Circuit Court of Mercer County, West Virginia. Pursuant to said Petition a Pre-Trial Conference was held in the case on January 25, 2011, and the case was set for trial in the Circuit Court of Mercer County, West Virginia, 1501 Main Street, Princeton, West Virginia, at 9:00 a.m. on April 11, 2011. The Pre-trial Conference hearing was attended by Michael J. Kanode, Sr., Dana P. McDermott and Janet Williamson, counsel for respondent Adrian Hoke, Warden.

On April 11, 2010, a trial on Writ of Habeas Corpus was held in the Circuit Court of Mercer County, West Virginia, and attended by Michael J. Kanode, Sr., personally, Dana P. McDermott, counsel for Mr. Kanode, and Janet Williamson, counsel for respondent, Adrian Hoke, Warden.

At the evidentiary hearing Petitioner called to testify, after being first duly sworn, Scott Ash, Michael J. Kanode, Jr., Rex Kanode, Sr., Amanda Kanode, Sherry Kanode, Michael D. Cooke, Christy Ball and Michael J. Kanode, Sr. The

witnesses were cross-examined by counsel for respondent, Janet Williamson. After cross-examination respondent chose not to call any additional witnesses. The following exhibits were presented: No. 1. Princeton Rescue Squad Report, No. 2. Michael Cooke Letter of 2-20-09, No. 3. Mental Hygiene Order, No. 4. Rebecca Thornsbury Statement 1/15/07. No. 5. Michael J. Kanode, Jr. Letter, and Michael J. Kanode, Sr. Letter.

After the witnesses testified both sides made closing arguments and a briefing schedule was agreed upon. This decision is made pursuant to the previous mentioned matters.

## FINDING OF FACT:

1. Michael J. Kanode, Sr. (Petitioner) and Sherry Kanode were married for a period of twenty-five years at the time of the underlying criminal trial held on January 22, 2008. Two children resulted from this marriage, namely, Michael Joe Kanode, Jr. age 24 and Makayla Jade Kanode, age 2. Prior to July 18, 2007, they all resided at 200 Jennings Street, Princeton, West Virginia.

2. On the evening of July 18, 2007, an incident occurred at the Kanode home which caused the wife to obtain a divorce packet from the Mercer County Circuit Clerk's office. On July 20, 2007, she filed a Domestic Violence Petition in the Magistrate Court of Mercer County, West Virginia. An emergency protective order was issued and served upon Petitioner on July, 23, 2007, notifying him of certain relief and of the final hearing to be held July 31, 2007. The temporary Order required Petitioner to be out of the house where his wife lived. The parties had voluntary contact prior to the final hearing.

3. On July 31, 2007, a hearing was held in the Family Court of Mercer County, West Virginia, Judge Mary Ellen Griffith presiding. Petitioner and his wife appeared in person. The Court held that Sherry Kanode has proven the allegations of domestic violence or abuse by a preponderance of the evidence and

is entitled to mandatory relief as provided by W. Va. Code 48-27-204. The Domestic Violence Protective Order is a form order that provides boxes to check when relief is granted. There is a section for Mandatory relief which orders the respondent (Mr. Kanode, Sr.) To refrain from abusing, harassing, stalking, threatening, intimidating or engaging in conduct that places Petitioner(Sherry Kanode) in reasonable fear of bodily injury. It also prohibits possession and use of firearms or ammunition.

Permissive relief may be ordered by checking a box. Mr. Kanode was ordered:

1. Respondent shall refrain from contacting, telephoning, communicating with, harassing, or verbally abusing petitioner.

2. Respondent shall refrain from entering any school, business, or place of employment of Petitioner or other person named herein for the purpose of violating this Order.

3. This box was not checked. **It was designed to order possession of the marital domicile to either party.**

4. Arrangements were made for obtaining keys, personal property, etc.

5. Custody of Makayla Kanode was given to Sherry Kanode.

6. Mr. Kanode was given visitation.

7. Mr. Kanode was required to pay child support.

The Order was to remain in effect for 90 days, October 31, 2007 and specifically states **"This Order terminates the emergency protective order entered previously in this case."**

4. On August 14, 2007, an incident occurred at the marital abode that resulted in the return of a 6 count indictment against Petitioner. The indictment was returned by a Mercer County, West Virginia, grand jury and was filed in open Court on October 10, 2007. Respondent was charged with Malicious Assault,

Burglary, Attempted First Degree Murder, Violation of a Protective Order, Wanton Endangerment, and Assault During the Commission of a Felony.

5. Michael Cooke, Esq. had been court appointed as counsel for Petitioner and appeared in Court with him on October 22, 2007, for an arraignment. When asked by Judge Swope if he had a copy of the indictment in this case he answered, "Yes, Your Honor". Further, the Court advised him of what he was charged and offered to read him the indictment or just take his plea. Mr. Kanode answered, "Take my plea", and entered a plea of not guilty.

6. On October 30, 2007, Michael Cooke, counsel for Petitioner, filed a Motion for Change of Venue and a Motion for Reduction of Bail.

7. On November 7, 2007, Petitioner's Motion for Reduction of Bail was denied because Petitioner was then serving a sentence which was recently imposed upon him in a prior case.

8. On January 2, 2008, Michael P. Cooke, counsel for Petitioner, filed a brief in support of the previously filed Motion for change of Venue.

9. On January 15, 2008, counsel for Petitioner listed Rodney Lucas, Kevin Wylum, Karen Jarrells, Arnold Edwards, Martha Reed, Robert Reed, Brian Meadows, Michael Kanode, Jr. and Michael Kanode, Sr., as witnesses to be called to testify for defendant during the trial of the case.

10. On January 22, 2008, a hearing was held during which the Motion for Change of Venue was denied. The Court permitted the State to use evidence of flight. The Court found Petitioner's statement was voluntary, but the State did not wish to use the statement in its case in chief. The Court further found the evidence of prior bad acts by Petitioner would be admissible to establish intent, plan and absence of mistake. The Court found the act was committed by Petitioner, purpose of its use was proper, it was unlikely it would cause confusion or unfair prejudice and a proper cautionary instruction would be given. Michael P. Cooke

reasonably participated in the proceedings.

11. On January 22, 2008, the trial began. No other motions had been filed by Michael P. Cook, counsel for Petitioner.

12. Just prior to voir dire the judge offered hearing devices to anyone who might need them. (Tr. 8).

13. During voir dire Mr. Pendry, Ms Snead and Ms. Goforth asked to be excused and during a sidebar neither counsel objected. Mr. Frazier had served during a civil trial a year prior and he was excused with no objection by either side.

14. The State said, "The State intends to show that the house he was breaking into, or broke into, was his own home that he was prevented from going into by virtue of a domestic violence order." There was no objection by Mr. Cooke. The remainder of voir dire was reasonably conducted by counsel for the State and Petitioner. The judge was more than reasonable with regard to allowing the parties to ask questions , participate and in no way restricted either party. There was nothing on the record to indicate an issue that should have been explored in more depth by either side. (Tr. 4 - 57.)

15. During the State's opening statement he said, among other things, "**There was a single shot in the bedroom**. That shot went through her left ear; went through the meat of her neck; then, apparently, exited back through the middle of the neck." He went on to state that Petitioner exited the house, ran into the yard, and he heard several more gunshots. (Tr. 52).

16. Mr. Kanode's attorney made a reasonable opening statement with regard to the trial and advised the jury of the situation and the events which occurred during the early morning hours of August 14, 2007. No reference was made to the burglary charge, wanton endangerment and assault during the commission of a felony with reference to whether they were invalid charges.

(Tr.65-67).

17. Neither the State or Defense counsel mentioned that the Order of Protection issued by the Family Court of Mercer County, West Virginia did not award the victim, Sherry Kanode, temporary possession of the family residence. Nor did they mention that "This order terminates the emergency protective order entered previously in this case."

18. The witnesses for the State during its case in chief were David K. Ofsa, M.D., Sherry Kanode, Michael Joe Kanode, Jr., Robert Hoge, Brenda Machnic, Kevin Scott Wickline, and Lt. Mike Gills.

19. **David K. Ofsa, M.D.**: Dr. Ofsa was an emergency room physician at the Princeton Community Hospital on the night Mrs. Kanode was wounded. During the early morning of August 14, 2007, he examined Mrs. Kanode and she had a wound behind her left ear. She lost a lot of blood, but the bullet did not go into her brain. The ear was "injured a little". There was an entrance and an exit wound behind the ear. He did not know the direction of the bullet path. He could tell it was a gunshot wound. Cross-examination by defense counsel was adequate under the circumstances. (Tr. 68-71).

20. The Court took a break after the testimony of Dr. Ofsa and when the jury returned Juror No. 6, Thomas Caruso, advised the Court that he thought he had worked with Sherry Kanode at Health South, about 10 or 12 years ago. Mr. Caruso was asked several questions by the Court and offered to allow both counsel to question him and both declined. Mr Caruso stated that he could render a fair and impartial verdict and be fair to both sides. (Tr. 73-74).

The Court proceeded to go over Mr. Kanode's Newmann Rights with regard to his right to testify. (Tr. 77-81).

The counsel for defendant again objected to the introduction of evidence

pursuant to WV Rules of Evidence Rule 404(b). The objection was overruled.(Tr. 83).

21. **Sherry Kanode:** Sherry Kanode testified she was the wife of Petitioner, they were married for twenty-five years and had two children, Michael Kanode, Jr. (24) and Makayla Jade Kanode (2) and were all living together in the same house in Princeton, Mercer County, West Virginia, on July 18, 2007. She said Petitioner , physically attacked her in the home, hid the telephone and told her he was going to get a gun and shoot her. The next day she saw a doctor and on Friday July 20, 2007, obtained a domestic violence emergency protection order. She and her husband continued to spend time together at a motel and the marital home. After the final hearing on July 31, 2007, she had no further voluntary contact with her husband. (Tr.89).

She was awakened in the early morning hours of August 14, 2007 by her husband pulling her hair. (Tr. 90). She had put a chain latch on the back door prior to going to bed.

Petitioner pulled a gun, shot her and she lost consciousness. (Tr. 91-92). During the time she and her two children were still living in the home she found two letters in her son's room and she took them to the prosecuting attorney's office. She recognized the writing as her husband's and they were stamped with the regional jail insignia. Both letters were addressed to her son. They were admitted into evidence without objection. (Tr. 94-96). She testified that a domestic violence order was entered on July 31, 7007, it lasted until October 31, 2007, her husband attended the hearing and the order required him to stay away from her.(Tr. 96-97). **No questions were asked about possession of the home.**

Mr. Cooke conducted a reasonable cross examination of Sherry Kanode, however, **he never inquired about the possession of the house**, but he did ask

about the number of shots fired. Mrs. Kanode's response was "I remember I got shot."

21. **Michael Kanode, Jr.** He testified during the early morning hours on August 14, 2007, he was asleep and was awakened by hollering, screaming, and a single gunshot. His father appeared at his door and said "I love you-all, and bye." (Tr.108-109). He called 911 on his cell phone because the living room phone did not work.(Tr. 111). He told 911 that his dad had shot his mom and then went outside and shot himself. He only heard one shot inside the house. He heard more outside, later. (Tr. 112). He testified that when he went to bed on August 13, 2007, the backdoor chain was not cut or broken in any manner and he saw bolt cutters on the kitchen table the next morning that were not there the night before. (Tr. 119-120). There was one bullet hole in the wall. (Tr. 121). He did not believe his father drove a vehicle to the house. (Tr. 122).

Mr. Cooke established on cross examination that there was only one gunshot in the house and a few more shots were heard from around the corner. (Tr. 124). The remaining cross examination was conducted reasonably well.

22. **Vincent Robert Hoge:** Mr. Hoge is the Mercer County 911 director and he produced the 911 emergency call made by Michael Kanode Jr. during the early morning hours of August 14, 2007. There was no cross examination by Mr. Cooke . That is reasonable under the circumstances. (Tr. 130-131).

23. **Brenda Machnic:** The witness testified she worked in the Mercer County Circuit Clerk's office in the domestic violence division. She produced the Kanode domestic violence petition, emergency order and final order. The final Domestic Violence Protective Order was in effect on August 14, 2007. The Order was admitted into evidence and no cross examination was offered by Mr. Cooke. (Tr. 132-135) **The counsel for the State or the Petitioner made no mention that the house possession relief box was not checked.**

24. **Kevin Scott Wickline:** Mr. Wickline testified that he was the chief deputy of Monroe County, West Virginia, and he received a "tip" that Petitioner was in his area and wanted to turn himself in. They had established a place to meet, but Mr. Kanode did not appear. He and Trooper Havens conducted a search of the area. They found Mr. Kanode, Sr. at the top of the hill. He told them he attempted to shoot himself three times. He said his wife had shot him and grazed his head.

He offered no resistance and was taken to the jail. He declined medical treatment. Later he said he needed medical treatment and was taken to the Beckley Appalachian Regional Hospital. This occurred on August 17, 2007. Mr. Kanode, Sr. was advised of his Constitutional Rights and placed under arrest. A Miranda Rights form was signed by Petitioner. He testified that Petitioner admitted that he cut the chain on the back door with bolt cutters. Mr. Cooke conducted a reasonable cross examination.(Tr. 137-145).

25. **Lieutenant Mike Gills:** Mike Gills testified that he is a detective with the Mercer County Sheriffs department and was assigned to the Sherry Kanode wounding case. He arrived at the Kanode home at about 4:00 a.m. on August 14 2007. He found the chain lock on the back door had been cut and the bolt cutters were lying on the counter. In the bedroom there was a large amount of blood on the floor and one bullet hole in the wall. There was no blood anyplace but in the master bedroom. Mr. Cooke conducted a reasonable cross examination of Lieutenant Gills. (Tr. 146-156).

26. At the close of the State's case Juror No. 1, Mr Wiley told Circuit Clerk, Ms. Ball, that he saw a person he recognized in the hallway. At a sidebar conference out of the presence of the jury, the juror said he saw Rodney Lucas. He said Mr. Lucas was a friend of his wife. When asked if that would affect his ability to listen to the evidence, and bases solely on the evidence, render a fair and

impartial verdict, his answer was "No". The court asked further questions and he said he saw Mr. Lucas and Mr. Lucas threw up his hand. There was no evidence of a conversation between the juror, Mr. Wiley, and the witness, Rodney Lucas. Specifically, Mr. Ash, Mr. Cooke and Mr. Kanode agreed for the juror to stay on the panel. (Tr. 157-161).

27. At the close of the State's case and in response to the Court's inquiry, Counsel for the Petitioner made no motion to dismiss or judgment of acquittal on the charges of Burglary, Wanton Endangerment and Assault during the commission of a felony. (Tr. 160).

28. Counsel for the defendant, Michael J. Kanode. Sr., opened the defense by calling Rodney Lucas, Jr. To the stand.

29. **Rodney Lucas, Jr.:** Mr. Lucas testified that he was a cousin of defendant, Michael J. Kanode, Sr. And he never saw any evidence of domestic violence. He took Petitioner to a motel in July of 2007. Sherry Kanode and the baby visited the motel where Petitioner was staying. He rented the room for four or five nights.

On cross examination by the State, he said he rented the room in his name for the Petitioner. (Tr.163-166).

30. **Kevin Wylum:** Mr. Wylum testified that he was a friend of Petitioner and allowed him to stay in his home when he was "kicked out of the home." Petitioner parked his work van at the Wylum house. During the evening of August 13, 2007 the van was at the house and Mr. Kanode did not spend the night with Mr. Wylum.

On cross examination by the State he said he lived a mile or mile and a half from the Kanode residence. The van belonging to Petitioner was not on his property when he awoke. When he got home from work the van was there and it stayed there until it was removed by Detective Gills. (Tr.167-170).

31. **Jo Ann Ball:** Ms. Ball testified that she has known Petitioner since he was a little kid and has lived beside him for close to eleven years. Personally, she knew nothing about the marriage of Sherry and Michael Kanode, Sr.

On August 14, 2007, at 3:35 A.M. She heard gunshots and 15 minutes later she heard two more. She knew Mike and Sherry were having problems and thought Mike had killed them all and himself. A brief cross-examination was conducted by the State and established she heard gunshots and saw that the police arrived. (Tr. 171-175).

32. **Rex Allen Kanode:** He is the brother of Petitioner and was a frequent visitor to the home. He noticed they were having a little trouble. Mrs. Kanode was having mental problems and Petitioner was trying to get her help. Petitioner was working, tending the house and watching the little girl. On a previous occasion Petitioner was required to cut the chain with bolt cutters to get in the house. After getting inside Petitioner put a link back in the chain. This occurred before August 14, 2007. The witness saw his brother three or four days after the shooting near the witnesses home in Monroe County, WV. I advised him to turn himself in and talk to Officer Wickline. After Petitioner was apprehended he saw a "shot place" across his head.

Cross examination by the State focused on the cutting of the chain at the residence. (Tr. 176-184).

33. **Gary Ray Kanode:** He is the brother of Petitioner and never saw him direct violence towards Sherry Kanode. He saw Sherry direct violence toward Petitioner and she would go "berserk" on occasion. He saw the chain, but in mid July of 2007. The State had no cross examination. (Tr. 185-188).

34. When asked by the Court if Petitioner wanted to testify or remain silent, he responded, "I'll testify".

35. **Michael J. Kanode, Sr,:** Petitioner testified that he and his wife Sherry

were high school sweethearts and had been married for 25 years. In February of 2005 Sherry had an automobile accident, got on drugs and started hearing voices in 2005 when she was pregnant with her daughter. He never threatened Sherry. When the Domestic Violence Petition was filed he moved out of the house and stayed at various places. He supported his family and gave them everything he possible could. Petitioner and his wife had contact at various times after the Domestic Violence Petition was filed. On the day of August 13, 2007, Sherry wanted him to come to the house because she and the baby needed essentials. Petitioner decided to comply with her wishes and walked down to the house. He left his van at Kevin Wylum's home. For fear of getting into trouble herself, she asked him to wait until after dark.

He went to the house around midnight. Sherry appeared on the porch and motioned for him to come to the house. She let him in the back door.

They sat in the living room for an hour and she wanted to go in the bedroom, they sat on the bed and continued to talk.

Sherry then began talking about him feeding the kids rat poison and wanting their son's girlfriend. She had been accusing him of these allegations since she was discharged from the hospital at the end of April 2007.

He was preparing to leave when she pulled a gun from under a pillow and shot him in the side of the head. He threw her on the bed and the gun went off again. Sherry still had the gun in her hand. When she approached him again he hit her hand and the gun fell to the floor and went off again. Sherry fell on the floor. He grabbed the gun and left the bedroom. He met his son and said, "man, I love you all. Your mama shot me." "You know, I think she's shot." "I don't know if she's dead." "I don't know how bad I am." Then left.

He had the gun with him and he feared for his life. He was running and firing the gun to empty the cartridges. He threw away the gun in the woods. Then

he passed out from the gunshot wound and did not wake up until the next day. He stated he had no intenion of harming anyone when he went to the house.

He stated he was a dedicated, churchgoing man who raised his children in the church. He attended church every Thursday and Sunday. When he sought official help with his wife and received no help. He did not trust Mercer County Officers.

On cross examination Petitioner denied writing the two letters to his son and denied that his son could recognize his handwriting. He denied ever writing letters to his son. He insisted he did not write the two letters marked as State's Exhibits 1 and 2.

The Prosecuting Attorney gave Petitioner a pen and pad and ask him to write "witness" and "rat poison". Petitioner testified he never read or saw the two exhibits. Petitioner spelled both witness and rat with 2 tees, as they were spelled in the two letters. The remaining questions related to being seen with his wife, the Domestic Violence Order and the events at the time of the shooting. He said he did not try to kill himself and did not tell Chief Wickline he put the gun to his own head.

Petitioner denied cutting the latch chain and testified that the front door was unlocked.

On re-direct he testified that the State Police had broken the front door during a drug raid a few week earlier and he only had to push the door to gain entrance. He stated he had no reason to force his way into his house. It was his house, anyway. (Tr.190-218).

36. At this point the defendant rested his case and the State advised the Court that it had rebuttal witnesses. The lawyers agreed that self-defense was not relevant because they agreed defendant was stating it was an accident. The Court allotted 20 minutes argument time because he always allowed the time to the one

who wants the most. Court adjourned until 9:30a.m. January 23, 2008. The Court asked those persons who were using the hearing devices to leave them there.

37. The Court proceeded to determine which instructions were to be given and although Mr. Ash made a few minor corrections, there was no objection from Mr. Cooke that any of the instructions were in error. The Court then reviewed the proposed verdict form and there were no objections.

38. The State then presented Rebuttal Evidence.

**K. S. Wickline:** The witness testified that he arrested Petitioner, that Petitioner was respectful, cooperative and he gave a voluntary statement. Petitioner had a mark on the side of his head when arrested and declined medical treatment at that time.

Petitioner told him he had attempted to shoot himself three times. Mr. Cooke conducted a reasonable cross-examination. There was no further evidence offered in the case. Both sides rested. (Tr. Vol. II 21).

39. At the close of the State's case and at the close of all the evidence, Mr. Cooke did not propose a Motion for a Judgment of Acquittal on the charge of burglary, wanton endangerment, of Assault During the Commission of a Felony by shooting Sherry Kanode during the commission of a burglary. (Tr. 218 Vol. II 21-26).

40. The instructions were read to the jury.

41. INSTRUCTIONS;

The Court offered a general charged which included these specific instructions.

 A. Malicious Assault, unlawful assault, battery, assault and not guilty.

 B. Malice

 C. Burglary

D. Attempted murder of the first degree

E. Violation of a protective order

F. Wanton endangerment

G. Assault in the commission of a felony

H. Intent

I. Flight

J. Confession

There was no objection by the State or the Petitioner to any of the instruction given by the Court.

42. VERDICT

On January 23, 2008, the Jury found Michael Joe Kanode, Sr. Guilty of the following offenses.

1. Malicious Assault

2. Burglary

3. Attempted Murder of the First Degree

4. Violation of a Protective Order

5. Wanton Endangerment

6. Assault During the Commission of a Felony

The jury was polled and answered in the affirmative that this was their verdict.

Counsel for the defendant moved the court to set aside the verdict and grant the defendant a new trial. The motion was scheduled for disposition on February 22, 2008 at 1:15 p.m.

43. Post Trial:

1. The State filed a Motion to Revoke Bond on February 6, 2008. On February 12, 2008 an order was entered revoking bond.

2. Defendant, by counsel, filed a Motion for Home Incarceration on

February 19, 2008.

3. Defendant, by counsel, filed a Motion For Probation on February 19, 2008. This motion was denied on February 22, 2008.

4. Defendant, by counsel, filed a motion for a new trial on February 22, 2008. The motion failed to mention the validity of the charges of burglary, wanton endangerment, and assault during the commission of a Felony. This motion was denied on February 22, 2008.

5. Defendant, by counsel, filed a statement for Pre-Sentence Investigation on February 22, 2008.

6. On February 22, 2008, Michael J. Kanode, Sr. Was found guilty and incarcerated for the following offenses.

    A. Malicious Assault—not less than 2 nor more than 10 years.

    B. Burglary—not less than 1 nor more than 15 years.

    C. Attempted Murder in the first degree-not less than 3 nor more than 15 years.

    D. Assault During Commission of a Felony-not less than 2 nor more than 10 years.

    E. Wanton Endangerment-5 years.

    F. Violation of a protective Order- 1 year in Southern Regional Jail.

These sentences were to run consecutive with one another. Defendant was given credit for 190 days time served.

Mr. Kanode, Sr. was assessed all Court Costs, advised of his rights to appeal and remanded to the Southern Regional Jail.

44. On February 28, 2008, Michael Cooke, counsel for Petitioner filed a Notice of Intent to Appeal the underlying criminal case to the West Virginia

Supreme Court of Appeals.

45. On May 29, 2008, the Circuit Court of Mercer County, West Virginia, entered an order substituting R. Thomas Czarnik to replace the public defender's office because he was retained by Petitioner's family.

46. On June 25, 2008, R. Thomas Czarnik, counsel for Petitioner, filed a Motion for Reconsideration of the sentencing Order entered on February 28, 2008, and it was denied by Order dated June 26, 2008. A subsequent Motion for Reconsideration was filed by Petitioner on October 6, 2008, and was denied by Order entered the same day.

47. On or about December 11, 2008, R. Thomas Czarnik filed an appeal on Petitioner's behalf in the West Virginia, Supreme Court of appeals. The Petition for Appeal set forth three issues.

(A) The Petitioner was clearly subjected to Double Jeopardy at trial on the charges of Malicious Assault and Wanton Endangerment.

(B) There was insufficient evidence as a matter of law to support a charge of burglary, it being his residence from which he was not barred.

(C) If defendant could not be convicted of burglary, he could not as a matter of law be convicted on the charge of assault during the commission of a burglary, charged in count 6.

The Petition for Appeal was well written, easy to understand and well researched. It was an adequate Petition for Appeal filed on Petitioner's behalf.

48. On April 8, 2009, and Order was entered by the West Virginia Supreme Court of appeals which stated, in relevant part " Upon consideration whereof, the Court is of opinion to and doth hereby refuse said petition for appeal."

49. In May 1, 2009, Petitioner filed a Motion For Reduction of Sentence in the Circuit Court of Mercer County, West Virginia, which was denied by Order entered on May 18, 2009. Another Motion for Reduction of Sentence was entered

on November 9, 2009 as well as on December 9, 2009.

50. On October 21, 2009 Petitioner filed a writ of error and petition for rehearing which was deemed to be a petition praying for a writ of habeas corpus ad subjiciendum. The Court Ordered that a rule issue returnable before Honorable Derek Swope for appointment of counsel to file a petition for writ of habeas corpus.

51. On February 5, 2010, all three judges in Mercer County, West Virginia sent a letter to Hon. Robin Jean Davis seeking to be recused in this matter. Pursuant to such request Hon. John S. Hrko was appointed Special Judge to hear this matter by order entered September 23, 2010.

52. At a hearing held May 4, 2010, in the Circuit Court of Mercer County, West Virginia, Michael J. Kanode in person, pro se, and the Respondent appeared by George V. Sitler, II, pursuant to the Order of the West Virginia Supreme Court of Appeals entered on February 18, 2010. At Mr. Kanode's request Mr. Dana McDermott was appointed as counsel to file a Petition for Writ of Habeas Corpus on his behalf.

53. On August 26, 2010, counsel, Dana McDermott, filed "Petitioner's Amended Omnibus Petition For A Writ of Habeas Corpus Ad Subjiciendum" on behalf of Michael J. Kanode, Sr. It is the principal case, Civil Action No. 10-C-445.

54. A pre-trial conference was held in the Circuit Court of Mercer County, West Virginia, on January 25, 2011. Petitioner appeared in person and by counsel and Adrian Hoke, respondent, appeared by Janet Williamson, Assistant Prosecuting Attorney for Mercer County. The matter was set for trial on April 11, 2011.

55. The following issues were to be determined by presentation of written memoranda of law presented to the Court:

(A.) The Trial Court lacked jurisdiction. (Losh #1).

(B.) Consecutive sentences for the same transaction. (Losh #14).

(C.) Double Jeopardy. (Losh #22).

(D.) Defects in indictment. (Losh # 30)

(E.) Instructions to Jury. (Losh #42)

(F.) Claims of prejudicial statements by Prosecutor. (Losh #44).

(G.) Sufficiency of Evidence. (Losh #45).

(H.) Severer sentence than expected. (Losh #50).

(I.) Excessive sentence. (Losh # 51).

(J.) Defective trial transcript. (Losh #55)

56. The following issues were to be determined and presented by oral and documentary evidence.

(A.) Denial of counsel. (Losh #11).

(B.) Suppression of helpful evidence by Prosecutor. (Losh # 16).

(C.) The state's knowing use of perjured testimony. (Losh #17).

(D.) Ineffective assistance of counsel. (Losh #21).

(E.) Challenges to the composition of Grand Jury or its procedures. (Losh #28).

(F.) Failure to provide a copy of the indictment to defendant. (Losh # 29).

(G.) Refusal to call / subpoena witnesses. (Losh # 34).

(H.) Improper communications between prosecutor or witnesses and jury. (Losh #48).

(I.) Perjured testimony. (Losh # 54, added to Losh list).

(J.) Language barrier to understanding proceedings. (Losh # 10).

57. The following issues were waived in open Court by Petitioner and Counsel:

(A.) Losh # 4, Prejudicial Pre-trial publicity.

(B.) Losh # 20, Information in Pre-sentence Report erroneous.

(C.) Losh # 24, excessiveness or denial of bail.

(D.) Losh # 31, improper venue.

(E.) Losh # 37, non-disclosure of Grand Jury minutes.

Any grounds not specifically mentioned in the Pre-trial conference Order were **ORDERED** waived. The issues listed above were the only issues to be considered by the Court.

58. On February 1, 2011, March 14, 2011 and March 18, 2011, Orders were entered permitting Petitioner to obtain various telephone records which he wanted to review from Frontier Communications. Subsequently, Petitioner Moved the Court to take the testimony of these witnesses by calling their Florida homes and taking their testimony. The State objected and the court denied the motion as such a procedure would be highly subject to fraudulent testimony. Petitioner made no other suggestions as to how this testimony could be obtained.

59. On April 11, 2011, an evidentiary hearing on Petitioner's Omnibus Petition for Writ of Habeas Corpus Ad Subjiciendum was held in the Circuit Court of Mercer County, West Virginia. Petitioner, Michael J. Kanode, Sr. appeared in person and by counsel, Dana McDermott, and Respondent, Adrian Hoke, Warden, appeared by counsel, Janet Williamson, Assistant Prosecuting Attorney for Mercer County, West Virginia.

60, Petitioner, Michael J. Kanode, Sr., by counsel called the following witnesses to testify in his case in chief: Scott Ash, Michael J. Kanode, Jr., Rex Kanode, Sr., Amanda Kanode, Sherry Kanode, Michael D. Cooke, Christy Ball and Michael J. Kanode, Sr. The Respondent engaged in cross-examination of those witnesses and did not call any witnesses of its own to testify.

61. The witnesses called by Michael J. Kanode, Sr. testified in relevant part as follows:

**Scott Ash:** After being first duly sworn, Scott Ash testified that he did not get the case until after the grand jury returned an indictment. Mrs. Kanode, the victim, brought him letters to look at , he made copies and returned them to her prior to trial. When asked if he compared the contents of the letters admitted at trial and his copies, he answered, "probably not." He also said, "No, sir, I don't know that I compared them. He further testified that he didn't know if both protective orders admitted at the trial went back to the jury room during deliberations. This was done to prevent prejudice to the defendant because of undue emphasis on the domestic violence order. (Tr. 9-15).

**Michael J. Kanode, Jr.** After being first duly sworn, Michael J. Kanode, Jr. testified as follows: At the trial he testified he was awakened by a shot. Now he testified he couldn't say it was one shot, he didn't know it was two shots and he didn't know how many shots were fired. He and his father shared a post office box. He did not get the letters from the post office box. He was away for a few weeks and his mother and her sister had his keys and were picking up his mail. He had not given his mother permission to pick up his mail. At the time, he was in jail for a probation violation.

He testified that his mother had reported him to the police. During the trial nobody persuaded him and he agreed with his report to 911.

He and his cousin, Rodney Lucas, saw a juror and talked with him. He did not know the jurors name. Later he said Rodney Lucas talked to the juror and came back and told him there was someone on the jury who knows them. Rodney Lucas was presently incarcerated and did not testify at the Habeas Corpus proceeding. He testified that since the shooting his mother has contacted Petitioner and expressed a desire to get back together with him. He reiterated that without his permission his mother removed his letters from his post office box.

(Tr. 16-28).

On cross-examination he said he has never seen the letters in question. He further testified that he never gave false testimony in the trial. He insisted that he did not know what happened on the night of the shooting. He said he was never questioned about the letters at the trial. He agreed that the best evidence would have been what he told the 911 operator when he called.(Tr. 28-33).

On re-direct examination he said he never saw the letters but was angry about his mother giving them to the prosecuting attorney. He said Petitioner was at the house two days before the shooting. He said he testified at the trial when he went to sleep the chain lock was back and attached and based upon his present testimony he did not remember. He said he may have locked it, his mother may have locked it and he just assumed it was locked. He did remember that when he came in from fishing he locked the bottom lock on the same door. He said to ask his mother. (Tr. 33-37).

**Rex Kanode, Sr.** After being first duly sworn Rex testified that he is the uncle of Petitioner, but they were raised like brothers. Petitioner had Sherry Kanode in different hospitals trying to get her some help. During the trial he saw Michael Kanode Jr. and Rodney Lucas talking to a juror and when Rodney came back he said, "I don't think we have too much to worry about." He did not know the juror's name. But the juror spoke to the judge and the judge still put him back on the jury. He wasn't sure what they talked about. He said he heard Judge Swope say he didn't think it was an accident.

**Cross-examination:** Rex testified that he was at the trial and testified, but he did not tell Judge Swope about the alleged conversation with the juror. Nor did he tell Petitioner's lawyer. He did not know the juror and had never seen him before. (Tr. 38-45).

The incarcerated Mr. Rodney Lucas was in Virginia and had apparently

written a letter which he did not sign and Mr. McDermott offered in into evidence. The letter allegedly named the unknown juror. The Court refused to allow the letter into evidence. (Tr. 46-47).

**Amanda Kanode**: After first being duly sworn, Amanda Kanode testified that she was the wife of Rex Kanode, Sr., the uncle of Michael J. Kanode, Sr., petitioner. She knew Sherry Kanode had been committed to the Southern Highlands Regional Mental Health Center in April of 2007 and after she was released Sherry Kanode told her she was going to pay her husband back for having her "locked up."

When asked, "Did you witness something going on between a juror and witnesses at some break during the trial?" She answered, "Yes, sir. When they came back from lunch for lunch break, Michael Jr. and Rodney Lucas, Jr. came back in bragging that they had nothing to worry about; that the jury member was going to find him not guilty. Well, when the trial started back up, the jury member walked up and told Judge Swope that he talked to one of the witnesses at lunchtime." She did not know the name of the juror. She further testified that at the start of the trial and when they were getting ready to pick the jury she heard Judge Swope say that he didn't think it no mistake or accident. There was no clarification as to what he was talking about.

**Cross-examination**: During this stage of the testimony, she admitted that she told nobody about the alleged conversation the juror had with Michael Kanode Jr. and Rodney Lucas, Jr. and the reason she did not report it was that she really wanted Michael Kanode, Sr. to get off.

**Redirect**: Now she said she was afraid she would get in trouble with Judge Swope if the incident was reported.(Tr. 47-53).

**Sherry Kanode**: After first being duly sworn, Sherry Kanode testified, in relevant part, as follows: Her husband had her committed to a mental health facility in April of 2007, but she was not angry with him as a result of the commitment and

had no desire to get even with him. She obtained a temporary protective order against him in July 2007 and a final order around August 1, 2007. She testified that she did not go back around her husband after she got the final protective order and never invited him to the house on Jennings street.

During the evening of August 13, 2007, she locked the back door, went to bed , was awakened during the early morning hours of August 14, 2007, by Michael J. Kanode, Sr. and he shot her. She had previously locked the back door. **She testified that one shot was fired.** She was badly wounded. She tried to escape, he got in front of her and shot her in the left ear. Again she said there were no more shots fired in the house. After the shooting she remembered very little but did say her son called 911. She has no desire to get back together with her husband, the Petitioner. For the third time she said there was only one shot fired at her. Cross-examination revealed nothing more. (Tr. 54-65).

**Michael D. Cooke:** After being first duly sworn Michael D. Cooke testified that he was trial counsel for Petitioner in the underlying criminal case. After studying the indictment he did not believe he could get anything dismissed so he didn't file a motion. When asked if he noticed that the relief box in the Final Domestic Violence Protective Order relating to possession of the home was not checked ,his answer was **"No, I did not."** He said he had the letters written by Petitioner prior to the trial but he prepared no defense because Mr. Kanode wrote the letters. He had no memory of the chain of custody issue on the letters and Mr. McDermott told him that they had been in Sherry Kanode's possession. He replied to an ethics complaint filed by Mr. Kanode that he did not bring up the letters because it was his trial strategy; because it would make the victim more sympathetic to the jury. He further said using evidence of the victims mental issues would not have been an effective tool for impeachment purposes. There was documentary evidence that in April 2007, Mrs. Kanode was having hallucinations and Mr. Cooke stated that

Mrs. Kanode had a gunshot wound, it was documented, medical treatment was provided so it was apparent that it was not a hallucination.

He further testified that the first time he heard of someone talking to a juror was when he saw Mr. McDermott's brief and heard the testimony of the Kanode relatives. He remembered that one juror, Mr. Caruso had worked with the victim in the past and after Judge Swope inquired of Mr. Caruso even Petitioner agreed to allow him to set on the jury. This matter was resolved in a bench conference which Petitioner attended. Counsel for Petitioner insisted that the victim was friends with juror Caruso and there never was any evidence of that fact. It was addressed by Judge Swope during the trial.

Mr. Cooke testified that he was an employee of the Southern Highlands Community Mental Health Center for more than 15 years and was the coordinator of the developmental adult program, crisis on call coordinator and a coordinator of mental hygiene proceedings. He also denied that Petitioner complained of not hearing and Judge Swope always offered hearing devices to anyone who asked. The record in the criminal trial of Petitioner shows that Judge Swope made the offer. Petitioner never really expressed any interest of wanting different counsel. He knew little about the statement of Rebecca Thornsbury. If her statement is true, then Petitioner could very well be convicted of Wanton Endangerment. Cross-examination: Mr. Cooke did not recall Judge Swope talking to a juror during the trial, there were several versions of how many shots were fired and he knew the Petitioner's handwriting.(Tr. 66-86).

Christy Ball: After first being duly sworn, Christy Ball testified that she was a next door neighbor of the Kanodes on Jennings Street and often took care of the infant Makala Kanode.. She also "doctored the wounds" of Sherry Kanode after she was released from the hospital. The bullet went through Sherry Kanode's ear lobe and grazed her neck. There were no questions on cross-examination. (Tr. 87-

92).

**Michael J. Kanode, Sr.:** After being first duly sworn, Michael J. Kanode, Sr. testified that his wife had a grudge against him and just talked about his wife's mental condition. It was basically a rehash of his trial testimony. He said he was in the bed at the home asleep and his wife shot him. There was a struggle for the gun and his wife was shot in the struggle. He said three shots were fired, but he fired none of them. His wife fired all three shots. She had taken the gun from his van that was parked behind the house.

He denied saying the things he said to the son when he approached him near the bedroom. He said he told him his mother shot him, she may have been shot and that he was leaving. He said he did not have the gun when he left and he passed out in the woods and did not wake up until the next morning. When he awoke his brother was calling him on the cell phone and told him to get away from there.

He said Mike Cooke was appointed as counsel and Petitioner told him that he did not want him as counsel because he worked for the mental hospital and there was a conflict of interest. He said his wife and Mr. Caruso were friends for years and when Mr. Caruso was selected for the jury he objected. He said he voiced the objection to Mr. Cooke. He said he couldn't hear during the trial and requested a hearing piece. He further stated that he objected to Judge Swope sentencing him because he had filed an ethics complaint against Judge Swope. He thought the sentence was too severe, because he had never been in trouble. He denied writing the letters which were used in his trial. He alleged Sherry told him "they" threatened to lock her up and take her child if she didn't testify and say he shot her.

He further testified that he asked Michael Cooke to use mental problems of the victim during the trial(Tr. 101-128)..

**Cross-examination:** He basically denied everything he was asked and said he told Mr. Cooke and Judge Swope he did not want Mr. Caruso on the jury panel. He further said he requested the Court provide him with a hearing aid. He did not receive a copy of the indictment, but he did remember pleading not guilty. He denied reading the indictment.

**Redirect:** He said no self-defense instruction was offered and it was an accident.

62. The following exhibits were admitted into evidence in the Omnibus Habeas Corpus Proceeding:

a. No. 1, Princeton Rescue Squad Report.

b. No. 2, Michael Cook letter of 2-20-09

c. No. 3, Mental Hygiene Order.

d. No. 4, Rebecca Thornsbury statement.

63. The following exhibits were excluded from evidence:

a. No. 5, Michael J. Kanode, Jr. letter.

b. No. 6, Michael J. Kanode, Sr. letter

63. Both sides rested, made closing arguments, and a briefing schedule was set and later amended.

## CONCLUSIONS OF LAW:

In Losh v. McKenzie, 166 W.Va. 762, 277 S.E. 606 (1981), with regard to Petitions for Writ of Habeas Corpus, the court decided that at the conclusion of the hearing the judge should enter a comprehensive order which addresses not only the grounds litigated, but the grounds waived as well.

It is obvious from the face of the petition filed by counsel for Petitioner that he relied on the Losh list and Petitioner initialed and checked numerous issues from that list. Petitioner signed and filed a certificate attached to the Petition which states "My attorney has advised me that I should raise each and every ground which I feel may entitle me to habeas Corpus relief. He /she has further

advised me that any grounds not so raised are waived by me and may not ever be raised in State Court. I do not wish to raise any of the grounds initialed above, and knowingly waive them."

The grounds for Writ of Habeas waived in the Petition are:

(2) Statute under which conviction obtained is unconstitutional.

(3) Indictment shows on its face that no offense was committed.

(5) Denial to right to speedy trial.

(6) Involuntary guilty plea.

(7) Mental competency at time of crime.

(8) Mental competency at time of trial cognizable even if not asserted at proper time or if resolution not adequate.

(9) Incapacity to stand trial due to drug use.

(12) Unintelligent waiver of counsel.

(13) Failure of counsel to take an appeal.

(15) Coerced confession.

(18) Falsification of a transcript by prosecutor.

(19) Unfulfilled plea bargains.

(23) Irregularities in arrest.

(25) No preliminary hearing.

(26) Illegal detention prior to arraignment.

(27) Irregularities or errors in arraignment.

(32) Pre-indictment delay.

(33) Refusal of continuance.

(35) Prejudicial joinder of defendants.

(36) Lack of public hearing.

(38) Refusal to turn over witness notes after witness has testified.

(39) Claim of incompetence at time of offense, as opposed to time of trial.

(40) Claims concerning use of informers to convict.

(41) Constitutional errors in evidentiary rulings.

(43) Claims of prejudicial errors of trial judges.

(46) Acquittal of co-defendant on same charge.

(47) Defendant's absence from part of the proceedings.

(49) Question of actual guilt upon an acceptable guilty plea.

(52) Mistaken advice of counsel as to parole or probation eligibility.

(53) Amount of time served on sentence, credit for time served.

At the pretrial conference, in open court, Petitioner waived the following additional grounds:

(4) Prejudicial pre-trial publicity.

(20) Information in pre-sentence report erroneous.

(24) Excessiveness or denial of bail.

(31) Improper venue.

(37) Non-disclosure of Grand Jury minutes.

The primary issues in this case are the burglary charge, wanton endangerment charge, assault during the commission of burglary, and ineffective assistance of counsel.

W. Va. Code, 61-3-11, states , "(a) Burglary shall be a felony and any person convicted thereof shall be confined in the penitentiary not less than one nor more than fifteen years. If any person shall, in the nighttime, break and enter or enter without breaking or shall, in the daytime, break and enter, the dwelling house, or an outhouse adjoining thereto or occupied therewith, of another, with intent to commit a crime therein, he shall be deemed guilty of burglary." This same definition was used in the Court's instruction to the jury, but when reciting the elements it used the term "5. the dwelling house belonging to Sherry Kanode." Ownership is the focus of a burglary charge. State v. Scarberry, 187 W.Va. 251,

418 S.E.2d 361 (1992).

It is clear from the evidence in this case that Petitioner, Sherry Kanode, and their children resided in the home as a family and it was not until the temporary protection order was entered on July 25, 2007, did this status change. Sherry Kanode was awarded possession of the home until the final hearing on on August 1, 2007. The Permanent Order entered on August 1, 2007, did not grant her possession of the marital residence. Petitioner still had keys to the home and was not guilty of a crime against property, even if he did cut the latch chain with bolt cutters. He was not prohibited to go in the house and Sherry Kanode did not have legal possession of the property. The Family Court speaks only through it's orders and there was no order speaking of possession of the home. He may have been guilty of violation of a protective order, but not a crime against property.

W. Va. Code, 61-2-10, defines assault during the commission of a felony. If any person in the commission of , or attempt to commit a felony, unlawfully shoot stab, cut or wound another person, he shall be guilty of a felony.

Count 6 of the indictment of this case reads that Petitioner shot Sherry Kanode during the commission of a burglary. Therefore, if there was no valid Burglary charge, there was no possibility of being convicted of assault during the commission of a felony that did not exist.

W. Va. Code, 61-7-12, provides that any person who wantonly performs any act with a firearm which creates a substantial risk of death or serious bodily injury to another shall be guilty of a felony. The issue with regard to this charge is whether or not it is double jeopardy, because it is a lesser included offense of Malicious Assault and Petitioner was convicted of wanton endangerment involving a firearm and malicious assault.

This allegation arises out of the double jeopardy principals enunciated in Blockburger v. United States, 284 U.S. 299 (1932), and adopted by the West

Virginia Supreme Court of Appeals in State v. Gill, 187 W. Va. 136, 416 S.E. 253 (1992), which basically states that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or one, is whether each provision requires proof of a fact which the other does not.

Petitioner relies on State v. Wright, 200 W Va. 549, 490 S.E.2d 636 (1997), and the Respondent relies on memorandum decision of State v. Dennis Terrell Evans, filed September 13, 2011, in the West Virginia Supreme Court of Appeals. In Wright, supra, appellant was convicted of malicious assault, attempted murder, and wanton endangerment with a firearm. He fired one shot at the victim and hit him. On appeal he alleged the principles of double jeopardy were violated by his convictions of wanton endangerment and malicious assault because both convictions were based on one act involving the use of a firearm. The State confessed error on this issue.

The Court went on to decide that both convictions are predicated on a single act involving a single gunshot. The elements of wanton endangerment include: (1) the defendant (2) did wantonly perform (3) with a firearm (4) an act (5) creating substantial risk of (6) death or serious bodily injury to another. In this event, the elements of malicious assault include: (1) the defendant (2) maliciously (3) shot a firearm (4) causing bodily harm to the victim (5) with intent to maim, disfigure, disable or kill."....it would have been impossible for Mr. Wright to commit malicious assault with a single gunshot without committing wanton endangerment with a firearm." The Court concluded that wanton endangerment is a lesser included offense of malicious assault.

The Evans case, supra, is clearly distinguishable because it deals with two gunshots, wanton endangerment, and a charge of attempted first degree murder. Malicious assault was not germane to the issues of the Evans Case.

The U.S. Const. Amend VI, provides that a defendant in a criminal case is entitled to assistance of Counsel for his defense. This concept is also set forth in W. Va. Const. Art. III, §14 of the constitution of West Virginia. These constitutional provisions not only assure a defendant the right to counsel, but also assure that one receives competent and effective assistance of counsel. State ex rel. Strogen v. Trent, 196 W. Va. 148, 469 S.E.2d 7 (1996).

The most prevalent authority with respect to the right to counsel was enunciated by the by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984). In its opinion the Court established a two prong test to determine whether or not performance of trial counsel met the standard contemplated by the Constitution. That is, (1) was trial counsel's performance deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.

In reviewing counsel's performance in the underlying trial, I must apply an objective standard and determine whether, under the facts, the identified facts or omissions were outside the broad range of professionally competent assistance while at the same time refraining from engaging in hindsight or second-guessing the reasons for his decisions. One must ask, whether a reasonable lawyer would have acted as defense counsel did in the principal case.

A great deal of the problem with counsel's performance arose out of him not carefully reading the Final Order of Protection issued by the Mercer County Family Court Judge. The remaining problem arose out of his failing to read State v. Wright, supra, which is a leading case in West Virginia relating to malicious assault and wanton endangerment. These two errors led to virtually all of the inadequacies prevalent in his performance. There was no motion to dismiss three

counts of the indictment, no motions for judgment of acquittal, no objections to the instructions relating to these matters, and no adequate grounds for a motion made to set aside the verdict of the jury. Furthermore, the omissions of counsel with regard to Burglary, Wanton Endangerment and Assault during the commission of a felony resulted in Petitioner being convicted of three felonies which were unwarranted under the circumstances. In short, counsel provided ineffective assistance to Petitioner with regard to these three charges.

Petitioner claims error resulting from the admission of two letters allegedly written by Petitioner to his son and stolen from a mail box. The objection is that there was no chain of custody established at trial and that counsel should have objected to their use at trial. When presented in Court, the victim testified that she brought the letters to the prosecuting attorney's office in the fall, she recognized the handwriting of Petitioner, it was stamped that the writer was at the regional jail, that defense counsel had seen it, she found it in her home, and both letters were addressed to her son. Counsel argues that the prosecuting attorney should have at least compared the letters in victims possession to the letters he copied earlier to be sure that the victim had not tampered with them, however, the mere possibility or speculation that evidence could have been tampered with does not constitute sufficient ground for exclusion. State v. Davis, 164 W. Va. 783, 266 S.E.2d 909 (1980). Later they were admitted into evidence without objection of defense counsel.

At trial Michael J. Kanode, Jr. denied ever receiving correspondence from his father from jail. Then he admitted his father sent him letters. He said the letters in issue looked like letters he got from his father, it looked like his father's handwriting and they came from the jail. During the habeas corpus hearing he said he never received the letters and they were stolen from his mailbox.

When defense counsel was asked why he did not object to the letters being

admitted, he said he had copies of them , recognized his clients handwriting and could remember nothing more relating to the letters.

The Court finds that defense counsel had copies of the letters, recognized his clients handwriting and chose not to withhold from the trial an item of evidence that he knew was genuine. A sort of a foundation was laid for admission and to review a denial of admission must be under an abuse of descretion standard. Under the circumstances, this court does not find by a preponderance of evidence that the foundation was inadequate or they should not have been admitted into evidence. Nor do I find, under the Strickland Test, that counsel should have done anything other than what is reflected in the transcript.

With regard to any Petition for Writ of Heabeas Corpus, a trial judge must review and make specific findings to each allegation of the "Losh List" which has not been specifically waived by the Petitioner.

In this case, the relevant grounds to be addressed are as follows:

Losh 1. Trial Court lacked jurisdiction.

Lost 10. Language barrier to understanding proceedings.

Losh 11. Denial of Counsel

Losh 16. Suppression of helpful evidence by prosecutor.

Lost 17. State's knowing use of perjured testimony.

Losh 21. Ineffective assistance of counsel.

Losh 22. Double Jeopardy.

Losh 28. Challenges to the composition of grand jury or its procedures.

Losh 29. Failure to provide copy of indictment to defendant.

Losh 30. Defects in indictment.

Losh 34. Refusal to subpoena witnesses.

Losh 42. Instructions to the jury.

Losh 44. Claims of prejudicial statements by prosecutor.

Losh 45. Sufficiency of evidence.

Losh 48. Improper communications between prosecutor or witnesses and jury.

Losh 50. Severer sentence than expected.

Losh 51. Excessive sentence.

Kanode 54. Perjured testimony.

Kanode 55. Defective trial transcript..

With regard to any Petition for Writ of Heabeas Corpus, a trial judge must review and make specific findings to each allegation of the "Losh List" which has not been specifically waived by the Petitioner.

In this case, the relevant grounds to be addressed are as follows:

Losh 1. Trial Court lacked jurisdiction. Petitioner alleges that the errors or omissions by counsel, burglary charge, wanton endangerment charge, assault during commission of burglary charge, indictment, instructions and prejudicial remarks of the prosecuting attorney deprive the Court of jurisdiction.

The W. Va. Const. Art. 8, § 6, Circuit Court; Jurisdiction, Authority and Power, specifically states that Circuit Courts shall have original and general jurisdiction of all crimes and misdemeanors. Mr. Kanode was indicted, arraigned, held for trial and convicted of crimes and a misdemeanor in the Circuit Court of Mercer County, West Virginia. This Court can find no authority which states that errors committed during the course of a trial negates this provision of the West Virginia Constitution. The issues of alleged error are specifically dealt with during the course of this opinion. This court does not find by a preponderance that Losh 1 is a valid claim.

Losh 10. Language barrier to understanding proceedings. Mr. Kanode was obviously born in the United States and can read and write the english language. He has done so in many instances during this proceeding. Perhaps his claim that he could not hear the proceedings is a basis for this allegation. This is negated by

the fact that during the trial Judge Swope said, "You know it's not very good acoustics in here. So, if you can't hear, stick your hand up for us. That goes for you-all over here. We'll do our best to project and move around. Also, if you're really having trouble, we've got these hearing devices, which, apparently, do help us a lot." (Tr. 8). At that time Mr. Kanode said nothing.

Petitioner's trial counsel testified at the habeas corpus hearing that his client did not bring a hearing issue to his attention during the trial nor did he take a hearing device. (Tr. 81). However, at the habeas corpus hearing Petitioner said he told Judge Swope that he could not hear. (Tr. 123). This court does not find by a preponderance of the evidence that Losh 10 is a valid claim.

Losh 11. Denial of counsel. Part of this claim has already been addressed by the Court with respect to the charges of burglary, wanton endangerment, and assault during the commission of a felony. With regard to the charges of malicious wounding, attempted murder and violation of a protective order, defense counsel appeared at the arraignment with Petitioner, consulted with Petitioner, filed and argued a Motion for Change of Venue, Motion for Reduction of Bail, Prepared and filed Memoranda of Law, attended and participated in a pre-trial conference, discovered State's witnesses, engaged a private investigator to assist him in this matter, disclosed witnesses for the defense, subpoenaed witnesses for the trial, reasonably participated in voir dire, reasonably participated in the trial other than the previously mentioned errors, conducted reasonable cross examination of State's witnesses, determined not to us mental issues of victim as a tactical point, made a reasonable opening statement, objected to the introduction of 404 (b) evidence filed a motion for home incarceration, filed and argued a motion for a new trial other than the previously mentioned errors, prepared Defendant's Statement for Pre-Sentence Investigation, filed a timely notice of intent to appeal, and filed a motion to extend period for appeal. The Court is of the opinion that he

reasonably represented the Petitioner with regard to the charges of malicious assault, attempted murder and violation of a domestic violence protective order and his attendant conduct on these three charges did not prejudice the defendant. This claim has no merit.

Losh 14. Consecutive sentences for the same transaction. The Court is of the opinion that the preceding findings will correct the only erroneous result from the original sentence.

Once burglary, wanton endangerment and assault during the commission of a felony are removed, that leaves malicious assault, attempted murder and violation of a protective order. In State v. George, 185 W. Va. 539, 408 S.E.2d 291(1991), our Court specifically held that a defendant may be convicted for both malicious assault and attempted murder in the first degree without violating the proscription against double jeopardy found within article III, section 5 of the West Virginia Constitution since the provisions for each offense require proof of an additional fact which the other does not. This same logic is equally applicable to the conviction for violating the terms of a Domestic Violence Protective Order.

Losh 16. Suppression of a transcript or helpful evidence by Prosecutor: There is no evidence in this case that a transcript or helpful evidence was suppressed by the Prosecuting Attorney or that he withheld helpful evidence. With regard to the protective orders he said he did not send them back to the jury room for fear of prejudicing Petitioner.

Losh 17. State's knowing use of perjured testimony. This allegation boils down to who does one believe with regard to the conflicting testimony of Petitioner and the victim, Sherry Kanode, as to what happened during the early morning hours of August 14, 2007. There is also the issue of how Sherry Kanode, the victim, obtained the two letters allegedly written by Petitioner to his son. Sherry Kanode testified that she found the letters in her son's room at the home and Michael J.

Kanode, Jr. testified that they were stolen from his post office box. There is simply not a preponderance of the evidence to convince this Court to act on this allegation, therefore, it is without merit.

Losh 21. Ineffective assistance of counsel. This Court is of the opinion that the allegation of ineffective assistance of counsel as to the charges of burglary, wanton endangerment and assault during the commission of a felony is valid. However, not as to malicious wounding, attempted murder and violation of a Domestic Violence Protective Order.

Losh 22. Double Jeopardy. It is clear that this ground applies to the wanton endangerment charge, but none of the other charges.

Losh 28. Challenges to the composition of grand jury or its procedures. There was no evidence of this allegation presented. It is therefore determined to be waived.

Losh 29. Failure to provide a copy of indictment to defendant. In an Order entered October 27, 2007, it states that the defendant, Michael J. Kanode, Sr. advised the Court that he had been furnished a copy of the indictment, that the defendant was knowledgeable of the charges contained therein and the penalty for said charge, and the defendant entered a plea of not guilty to the indictment

A transcript of a hearing held on October 22, 2007, states that the defendant, Michael J. Kanode, Sr. was present in person and by counsel. Judge Swope asked, "Do you have a copy of the indictment in this case?" The defendant answered, "Yes, your honor." The Court finds that there is no merit to the allegation of the Petitioner that he never received a copy of the indictment in this case. (Record of hearing held October 22, 2007).

Losh 30. Defects in indictment. If there were any defects in the indictment they related to the charge of burglary, wanton endangerment, and assault during the commission of the felony of burglary. Those issues have been adequately

discussed in this opinion and no other issues remain with regard to this allegation.

Losh 34. Refusal to subpoena witnesses. At no time during the habeas corpus hearing did Petitioner testify that anyone refused to subpoena witnesses.(Tr. 101-128). In fact, the case file indicates Mr. Cooke subpoenaed several witnesses. Therefore, the Court finds there is no merit to this allegation.

Losh 41. Constitutional errors in evidentiary rulings. The only issue with regard to this allegation relates to the admission of the two letters the victim, Sherry Kanode, found in her son's room which were written by Petitioner. This has already been adequately discussed in this opinion.

Losh 42. Instructions to the jury. This issue has already been addressed with respect the instructions given on burglary, wanton endangerment and assault during the commission of a felony.

Petitioner complains of the failure to give an instruction on self defense. A review of transcripts of the criminal trial and habeas corpus proceeding reveals that it appears throughout both proceedings Petitioner maintained the wounding of Sherry Kanode was an accident. His testimony at the habeas corpus hearing was, "Like I say, it was an accident; that's all I can say."(Tr. 128). Both counsel participated in the formulation of the instructions and there was no objection to any given. All instructions were "boilerplate" instructions used in all circuits in the State of West Virginia. This claim has no merit.

Losh. 44. Claims of prejudicial statements by prosecutor. A criminal trial is an adversarial proceeding and the interests of the public are represented by the prosecuting attorney and the interests of the individual charged with a crime are protected by defense counsel. However, it is not that simple when we consider the role of the prosecuting attorney. The prosecuting attorney occupies a quasi-judicial position in the trial of a criminal case. In keeping with this position, he is required to avoid the role of a partisan, eager to convict, and must deal fairly with

the accused as well as the other participants in the trial. It is his duty to set a tone of fairness and impartiality, and while he should vigorously pursue the State's case, in so doing he must not abandon the quasi-judicial role with which he is cloaked under the law. State v. Critzer, 167 W. Va. 655, 280 S.E.2d 288 (1981), State v. Boyd, 160 W. Va. 234, 233 S.E.2d 710 (1977).

Petitioner contends that the prosecuting attorney did not lay a proper foundation for the introduction to the two letters introduced into evidence, should not have pursued the charges of burglary, assault during the commission of a felony, and wanton endangerment, and failed to insist that the Final Protective Order be sent to the jury room during deliberations.

The foundation for the letters has already been discussed in this opinion and will not be further considered. The prosecuting attorney stated during the hearing that he did not get the case until after it was presented to the grand jury. (Tr. 11). He further testified that he did not insist that the Orders go to the jury room probably to prevent prejudice to the defendant because of undue emphasis on a domestic violence order. He did not testify whether or not he noticed that the possession of the home box was not checked. (Tr. 15).

The Court is of the opinion that this allegation was not established by a preponderance of the evidence and, therefore, is of no merit.

Losh 45. Sufficiency of the evidence. A reading of the record in this case clearly establishes that the State proved that a crime was committed in Mercer County, West Virginia on August 14, 2007, Petitioner cut a door chain and entered a house occupied by Sherry Kanode, shot her with a firearm, told his son "I killed her", his son called 911, the wife was taken to the hospital and treated for a gunshot wound. There was conflicting testimony, but the jury accepted the version alleged by the victim, Sherry Kanode. Therefore, this Court does not find merit in the allegations of Losh 45.

<u>Losh 48.</u> Improper communications between prosecutor or witnesses and jury. During the trial of the case there were issues with regard to the jurors who were present. After a comprehensive voir dire in which both counsel were permitted to participate, the jury was reduced to 23 people who were free from exception. (Tr. 46) From those 23 people 12 regular jurors and 1 alternate was selected.

During the first full day of testimony at the trial and after a break which was taken at the conclusion of Dr. Ofsa's testimony, the bailiff told the court that Juror Number six said he knows Sherry Kanode, and that he worked with her about 15 years ago. His name was Thomas Caruso. The juror was questioned by the Court and the lawyers were given an opportunity to pose questions. The Court asked "does the fact that you know her, would that affect your ability to listen to the evidence in this case, and render a fair and impartial verdict?" He answered No. He further said he could be fair to both sides. Both counsel were given an opportunity to inquire, but neither had questions. Mr. Caruso was permitted to remain on the jury.(Tr. 74)

After the State rested, it was brought to the Court's attention that there was an issue as to Juror Number one, Jerry Wiley. Both counsel and Mr. Kanode were brought to the bench along with Mr. Wiley. (Tr. 157). Mr. Wiley said he saw a lady in the hallway that he thought he knew. He said he thought it was a woman, but it was Rodney Lucas. He said Mr. Lucas was a friend of his wife's 10 years ago when they were in highschool. He told the Court he could listen to the evidence and based solely on the evidence, render a fair and impartial verdict. From pages 158 to page 161 a voir dire was conducted and Mr. Wiley said Mr. Lucas threw his hand up to him and that was when he recognized him. At the conclusion of the voir dire neither the prosecuting attorney or defense counsel objected to the juror. The Court said, "Mr. Kanode, is it all right with you to stay on here?" Petitioner answered, "Yes, sir." He was left on the jury. (Tr. 161).

There was no mention of Mr. Lucas talking with the juror, Mr. Wiley. Rodney Lucas later testified. There was no other issue of juror misconduct reported, considered or on the record in the trial.

There was testimony during the habeas corpus hearing three years later with regard to juror misconduct.

Michael J. Kanode, Jr. testified that he and his cousin Rodney Lucas talked to a juror during the trial. He did not identify the juror or the subject matter of the conversation, but it was with Rodney Lucas. Mr. Lucas, conveniently, was presently incarcerated in the State of Virginia and no subpoena was issued to obtain his presence at this hearing.

Rex Kanode, Sr., cousin of Petitioner testified that he saw Michael Kanode, Jr. and Rodney talking to a juror, but did not report it to anyone, especially after Rodney Lucas told him "I don't think we have too much to worry about". He could not identify the juror. He said, "Yeah, we don't have a name." (Tr. 41-42). He also said he heard Judge Swope say, before they started anything, he didn't think it was an accident. There is nothing in the record to verify the alleged statement of Judge Swope. This was verified by the testimony of Amanda Kanode, the wife of Rex Kanode, Sr. She did add that she heard the juror tell Judge Swope that he talked to a witness. (Tr. 49). She did not know the name of the juror and reported it to nobody.

Mr. Cooke testified that he first found out about about the juror misconduct allegations when he read Mr. McDermott's brief.(Tr. 76).

When Petitioner was cross-examined by counsel at the habeas corpus hearing he said he told the Judge and Mr. Cooke that he objected to Mr. Caruso sitting on the jury. This is in direct conflict with the record in the trial.(Tr. 112 and Tr. 123).

With regard to this alleged ground for habeas corpus relief, the Court finds

that the testimony of the witnesses Rex Kanode Sr., Amanda Kanode, and Michael J. Kanode, Jr.,with regard to Juror Wiley is not worthy of belief. This Court rejects the allegations of juror misconduct and Judicial misconduct was not established by a preponderance of the evidence. In short, it has no merit.

Losh 50. Severer sentence than expected. The sentence applied by the Court is in conformity with the verdict rendered by the jury in the underlying trial. However, when one considers that burglary, wanton endangerment and assault during the commission of a felony is declared void, then there will be a less severe sentence.

There were no other factors presented to the court and established by a preponderance of the evidence. It is safe to say when one is convicted of a crime by a jury verdict, then one can expect the maximum sentence. This claim has no merit.

Losh 51. Excessive sentence. The sentence received by Petitioner is in conformity with the offenses of which he was convicted. Those offenses were: Malicious Assault, Burglary, Attempted Murder of the First Degree, Violation of a Protective Order, and Assault During the Commission of a Felony. Petitioner received the maximum sentence for each offense. On its face it is a proper sentencing order.

However, when one takes into consideration that he should not have been convicted of burglary, wanton endangerment, and assault during the commission of a felony, then it is excessive.

Kanode 54. Perjured testimony. This allegation appears to be identical to Losh 17 and it has already been determined to be without merit.

Kanode 55. Defective Trial Transcript. There was no credible evidence introduced by testimony or memoranda of law to convince the Court that the trial transcript was defective by a preponderance of the evidence. This claim has no merit.

Based upon the underlying trial transcript, arraignment transcript, habeas corpus evidentiary hearing, exhibits presented in all proceedings, memoranda of law provided by counsel and oral arguments, the Court finds as follows:

It shall be, and hereby is, **ORDERED** that Petitioner's conviction of the crimes of Malicious Assault, Attempted First Degree Murder and Violation of a Protective Order in the Case of State of West Virginia v. Michael Kanode, Sr., Criminal Action No. 07-F-330 in the Circuit Court of Mercer County, West Virginia, are declared valid.

It shall be, and hereby is, **ORDERED** that Petitioner's conviction of the crimes of Burglary, Wanton Endangerment and Assault during the Commission of a Felony(burglary) in the Case of State of West Virginia v. Michael Kanode, Sr., Criminal Action No. 07-C-330 in the Circuit Court of Mercer County, West Virginia are set aside and vacated, with prejudice.

The probation office of the Circuit Court of Mercer County, West Virginia, is hereby **ORDERED** and directed to conduct a pre-sentence investigation in this matter.

It is further **ORDERED** that upon completion of the pre-sentence report in this matter, a sentencing hearing be held in State of West Virginia v. Michael J. Kanode, Sr., Criminal Action No. 07-F-330.

**TO ALL OF WHICH, PETITIONER AND RESPONDENT OBJECT AND TAKE EXCEPTION.**

Any party desiring to appeal this decision to the West Virginia Supreme Court of Appeals in Charleston, West Virginia, must do so within four (4) months.

Nothing further to be done in this action at this time it is **ORDERED**

continued until such time as a pre-sentence report is completed and scheduled for sentencing.

Date: December 15, 2011.

ENTER;

_John S. Hrko_

SPECIAL JUDGE JOHN S. HRKO

ATTESTED COPY
THE FOREGOING IS A TRUE COPY OF A DOCUMENT
ENTERED IN THIS OFFICE ON THE _16th_ DAY
OF _December_ 20__
DATED THIS _19th_ DAY OF _December_
20_11_

JULIE BALL, CLERK OF THE
CIRCUIT COURT OF MERCER COUNTY WV

BY _Angria S. Fox_
HER DEPUTY